## Wolford v. Wolford, Appellant.

252

Argued October 29, 1930.

Before
TREXLER, P. J., KELLER, LINN, GAWTHROP, CUNNING-
HAM, BALDRIGE and WHITMORE, JJ.

*J. Colvin Wright,* for appellant.

*Simon H. Sell,* and with him *Harry C. James,* for
appellee.

OPINION BY TREXLER, P. J., January 30, 1931:
Libellant brought suit for divorce charging that his
wife, the respondent, had committed adultery with
Alvin Reighard on September 3, 1929, at Ellerslie,
Maryland. The master recommended a decree and

the court granted the divorce. The respondent, the wife has appealed.

The parties were married in 1918 when the libellant was twenty-nine and the respondent nineteen. They have an eleven year old daughter. Since June, 1927, the parties have lived in Hyndman, Bedford County, the libellant working in Johnstown, and making infrequent visits to his home.

On the evening of September 2, 1929, Mrs. Wolford, the respondent, and Mrs. Dunlap, a friend, attended a dance, and after leaving the dance drove down to a restaurant kept by Reighard, the co-respondent. The husband, who was watching his wife, followed with a nephew in an automobile and testified as follows: "I followed them right into Ellerslie. They went down and turned up to the gas station and stopped in front of the gas station. I run off the cement down to the railroad. They took gas there and stood there at the gas station. Pretty soon the lights all went out and the car moved away and I couldn't see where it went. John Wolford, my nephew, and we got in his car and I laid down between the seats and he drove down around by Mr. Rick's [Reighard's] place and John spied my Chevrolet sedan standing out by the garage at Ellerslie. We drove around then and backed his car up and parked it and I said let's go down and see where the Mrs. is, and he decided it was not a very safe proposition to go unarmed and he decided to go for the State Constabulary. I didn't like that very well, but he beat me out and he went after the State Constabulary. I got in the car and sat there until he came back and while I was sitting there, I didn't know which room the ladies were in, but there was a gentleman came up with a light pair of pants and shirt and he went to the poolroom. He was left in and then I knew which room they were in and when John came back I told him which room they were in

and he went to the back door and I went down to the front door. I walked up to the door and Mr. Rick was sitting right inside the door on a chair and Martha there was sitting on his lap with her arms around his neck. Martha Wolford, my wife. I opened the door and she jumped up and I said, Rick don't start anything rough and I said turn on the lights—and he hesitated, then John came around and John said, Rick turn on the lights and afterwards Rick did turn on the lights. John walked back, he had a piece of jack handle about 18 inches long. He walked back in through the poolroom and he said here is the other two and I walked in and there they were sitting. Mrs. Dunlap was one and they claim a man by the name of Clawson. It must have been about 11:45 as near as I can say when they pulled up to the gas station, because after we done all that running around and John started for the state cop it was just 12 o'clock I looked at the time when he started," "the lights were off all the time."

The nephew testified the lights were out in the room, but there was a light on in the gas station. The room was in the shape of an "L" and the nephew testified that in the short arm of the "L" there was a day bed on which Mrs. Dunlap and a Mr. Clawson were sitting.

This is in substance the plaintiff's case, excepting that he introduced the testimony of two girls to the fact that Mrs. Wolford had sent two notes to Reighard about a year before. The notes were not produced; Reighard disavowed any knowledge of them, but one of the girls testified that she had read the notes. The contents of the one was "meet me tonight at the old farm house." As to the other, the witness disclaimed any definite recollection, as the occurrence had been over a year ago, but it was to the effect that respondent's mother had been visiting her and she would see

Reighard the following night and that it had been a long time since she had seen him. The one note was put under the door at Reighard's place and the other one was in an envelope sealed up (sic.) and she gave it to Reighard. When she gave the second one to Reighard at the request of the respondent, she was to ask him why he did not answer the letter and he answered, "I destroyed it because I did not know who to write to."

There is no dispute as to the fact that these women were at the dance hall and that after the dance they went to Reighard's poolroom and restaurant, that they got gas there and went in and sat at the table and that Mrs. Wolford ordered some pop. There is no corroboration of the fact that Mrs. Wolford sat on Reighard's lap. The proof as to the poolroom being dark is not at all satisfactory. It appears that at the time when these women were in the poolroom, a man by the name of Fisher came in at about 12:20, that there was a light on in the room, in what was called the kitchen, he was there about eight minutes, saw Reighard and the respondent, he bought a package of cigarettes, gave Reighard a ten dollar bill and he gave him the change. The light in what was known as the kitchen, the short arm of the "L," was suspended and shown over the partition which enclosed that part of the room. The lights in front from the gas station shone through the windows into the room and all the evidence, save that of the respondent and his nephew, clearly showed that when they said the lights were out, they were not telling the truth, or were referring to the lights that were in the main part of the room. Fisher said that he would not have gone into the room, unless the lights would have been lit. A careful examination of the testimony convinces us that at no time was the room so dark that the action of those inside could not have been seen by one look-

ing in. It may be that Mrs. Wolford and Mr. Reighard were attracted to each other. The letters would indicate that the woman at least desired the company of the man, but something more is necessary to supply the proper degree of proof to enable the court to properly grant a divorce. The burden is on the libellant to establish a case clearly within the statute. It is true, as the master says, that it is not necessary for the libellant to prove the direct fact of adultery, but we may presume it from other circumstances such as lead the mind to this belief by fair inference, but in the present case the facts as narrated do not support the conclusion that the parties charged were guilty of adultery at the time and place set out in the libel. The respondent and co-respondent denied all the charges.

If these parties had gone to this poolroom and had been in there in total darkness, it may be that the inference might have been drawn that they were guilty, but the room in which they were was open for business and a customer came in, bought cigarettes and changed money. People, when they desire to commit adultery, do not do it under such conditions. There was no evidence of any prearranged meeting. Reighard was there as the proprietor of the restaurant and poolroom; Clawson was a habitual frequenter of the restaurant. The door was not locked. This was not a private home.

As we have stated before, the question before us is did Mrs. Wolford and Mr. Reighard commit adultery on the night of September 2nd or on the early morning of the 3d? The proof submitted did not establish that fact and there were no circumstances which would sustain the inference that such misconduct occurred.

The decree of the lower court is reversed, the appellee to pay the costs.